In re CUMBERLAND CARE CENTER, Appellant; Director of Health, Appellee.

[Cite as *In re Cumberland Care Ctr.* (1997), 123 Ohio App.3d 616.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APH05–654.

Decided Nov. 4, 1997.

*Webster & Associates, Geoffrey Webster* and *Brenda J. Graf*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Kent M. Shimeall*, Assistant Attorney General, for appellee, William Ryan, Director of Health.

---

BOWMAN, Judge.

In February 1995, appellant, Cumberland Care Center, through its president and sole shareholder, Thomas Rosser, filed an application for a certificate of need ("CON") with the Ohio Department of Health ("ODH") to construct a new eighty-three-bed nursing home in Licking County. The proposed new nursing home was to include thirty-three replacement beds for Pine Kirk Nursing Home,

thirty-five replacement beds for Utica Nursing Home, and fifteen additional beds approved under an earlier CON issued to Utica that was never put into effect. Pine Kirk Nursing Home is operated by Living Care Alternatives of Kirkersville and Utica Nursing Home is operated by Living Care Alternatives of Utica. Rosser and his wife are the sole shareholders of each corporation. The projected cost, as set forth in the CON application, was $3.58 million to be completely financed through loans.

After two requests for additional information, the CON application was deemed complete in April 1996. In May 1996, the Director of Health notified appellant that its request for a CON was denied. The director denied the CON because there was a question as to clear ownership of operating rights, the project was not shown to be financially feasible, and appellant had been unable to comply with a previously granted CON. Appellant requested a hearing pursuant to R.C. 3702.60. The hearing officer recommended that the application be denied. Appellant's objections to the report and recommendation of the hearing officer were overruled. As the Director of Health stated in his order:

"In addressing financial feasibility, the hearing officer correctly found that there was no evidence that a binding loan agreement was ever entered into by the applicant, that the amount of the loan necessary to carry out this certificate of need was substantially greater than what had been proposed by the applicant to the Department in the certificate of need application, and that the testimony at the hearing evidenced cost overruns for this application that amounted to more than the cost overruns permitted by law. As succinctly stated by the hearing officer, the 'applicant has provided evidence that * * * a loan is possible * * * nothing more.'

"In addressing historical performance, the hearing officer found that an applicant's inability to obligate capital expenditures for a previous certificate of need was a proper consideration for the director to utilize in considering whether or not to grant a certificate of need. In this case, the applicant's recent failure to obligate capital expenditures in a different certificate of need supports my concern that this applicant does not have the ability to carry out this certificate of need application."

Appellant timely filed the notice of appeal and has set forth the following assignments of error:

"Assignment of Error No. 1.

"The Journal entry of the Ohio Department of Health denying certificate of need file 8038–01–95 is not supported by reliable, probative and substantial evidence and is not in accordance with law.

"Assignment of Error No. 2.

"The journal entry of the Ohio Department of Health denying certificate of need file 8038–01–95 erred by considering the past history of the appellant in complying with previously approved certificates of need."

R.C. 3702.60 provides that any affected person may appeal the director's ruling to the Tenth District Court of Appeals. The standard for review for this court is set forth in R.C. 3702.60(F)(3), which provides:

"The court shall affirm the director's order if it finds, upon consideration of the entire record and any additional evidence admitted under division (F)(2) of this section, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it shall reverse, vacate, or modify the order."

At the hearing, the ODH stated that issues as to ownership of operating rights had been resolved and, therefore, the issues to be determined at the hearing were whether the project was financially feasible and appellant's compliance with a previously issued CON.

In its first assignment of error, appellant contends that the director erred by finding that the project was not financially feasible. R.C. 3702.52 authorizes the director to administer the CON program in accordance with the Revised Code and rules promulgated by the Public Health Council. R.C. 3702.57(A) requires the Public Health Council to promulgate rules establishing criteria for the issuance of a CON. R.C. 3702.57(A)(3)(d) provides:

"(3) The criteria for reviews of applications for certificates of need shall relate to the need for the reviewable activity and shall pertain to all of the following matters:

" * * *

"(d) The activity's short- and long-term financial feasibility and cost-effectiveness, the impact of the activity on the applicant's costs and charges, and a comparison of the applicant's costs and charges with those of providers of similar services in the applicant's proposed service area."

Pursuant to its statutory authorization, the Public Health Council has promulgated Ohio Adm.Code 3701–12–20(J)(1) through (4):

"(J) The director shall consider the current and long-term financial feasibility of the project and its financial impact upon the applicant, other providers, health care consumers and the medicaid program established under Chapter 5111. of the Revised Code. Among other relevant matters, the director shall evaluate:

"(1) The availability of financing for the project, including all pertinent terms of any borrowing, if applicable;

"(2) The operating costs specific to the project and the effect of these costs on the operating costs of the facility as a whole based upon review of balance sheets, cash flow statements and available audited financial statements;

"(3) The effect of the project on charges and payment rates for the facility as a whole and specific to the project; and

"(4) The costs and charges associated with the project compared to the costs and charges associated with similar services furnished or proposed to be furnished by other providers, when this information is available, and factors contributing to cost or charge differences."

Thomas Moore, a senior consultant with ODH, reviewed appellant's application. He recommended that the application be denied. His recommendation formed the basis for the director's denial. Moore testified that appellant's CON application stated its intent to obtain a loan insured by HUD through its Section 232 loan program. Moore admitted that HUD required that a CON be issued before it would insure the loan; however, he also testified that there should be some evidence of loan discussions with the bank before issuance of a CON. Moore stated:

"A. [I]t's fairly common that we get some type of letter from the bank or something of that nature that indicates that discussions have taken place, that indicates that the bank has looked at the project. There are commonly, you know, parameters set out as to how much money is going to be loaned, what they think they're going to do about it.

"Usually there's not an actual committment at that time to loan the money. That usually—but there's certainly some—from the letter you usually get a pretty clear indication that there have been ongoing—you know, there've been some ongoing discussions and so forth about it."

During cross-examination, Moore was presented with a letter from Sussex Mortgage Company, dated three days before the hearing, which stated:

"Pursuant to our conversation this morning, you are prepared to complete your loan application for the above noted project. It is our understanding that you intend to finance this project under the FHA 232 program. It is our opinion, that subject to FHA processing, this project would be suitable for financing under the 232 program."

Moore testified that the letter did not contain much information as to previous discussions between appellant and the bank in terms of loan specifics. In fact, the letter is little more than an expression of some interest in the loan contingent on a number of things to be done by appellant. Although appellant argues that Moore stated that CONs have been granted in the past on the basis of such letters, Moore's testimony was not so definite. Moore was asked the following question and responded:

"Q. But applications had been approved for financial feasibility with letters similar to that?

"A. I would imagine they have."

Moore was also asked about a letter from J. Development Corporation, dated the day before the hearing, which stated:

"The construction financing and permanent loan is [sic] ready and available for construction of your proposed 83 bed facility located in Reynoldsburg. Please keep us informed as to the progress in obtaining the C.O.N. for the above project. If we can be of any further assistance to you please let us know."

Moore admitted that this letter was a stronger commitment than that from Sussex Mortgage, but again testified that there was no specificity as to terms and conditions of the loan. Moore did not specifically state that a CON had been granted on the basis of a letter such as the one written by J. Development, but rather stated:

"Q. * * * But then again haven't many applications been approved as financially feasible with letters similar to that?

"A. I think in many cases—I can't say for sure, but I would imagine that that may have happened, yeah."

Moore also testified that, while the CON application was pending, he received a letter from County Savings Bank stating that Living Care Alternatives of Utica was in default on its loan, there were liens filed by the Ohio Bureau of Workers' Compensation and the Internal Revenue Service, and the bank was considering foreclosure. Although some of the issues had been resolved by the time of the hearing, Moore was still concerned that future lenders would be aware of the problems and that the financial feasibility of the project would be affected.

Rosser, the sole shareholder and president of Cumberland Care Center, testified as to efforts to obtain financing. Rosser talked with four groups that might consider financing, including Sussex Mortgage, J. Development, Alter Care, and Fred Schwab Architect Development Company. County Savings Bank, which had provided financing for Pine Kirk and Utica, apparently no longer financed projects for long-term-care centers. Rosser candidly admitted that, while Key Bank finances long-term-care centers, it was not interested in him based on heavy losses sustained by his two nursing homes.

Rosser testified that at the time of the hearing, J. Development was the most likely source of funding. According to Rosser, the discussion with J. Development generally proposed that it would obtain financing from Bank One and loan it to Rosser at 10.25 percent interest, plus a $150,000 fee for a loan total of $4.9 million. Although the projected cost of the project was $3.58 million, Rosser

contemplated borrowing additional funds to pay the $150,000 fee to J. Development, to pay off a $400,000 lien to the Internal Revenue Service, and for $900,000 in projected costs overruns. This arrangement was considered preferable by Rosser to negotiating with Sussex Mortgage for a $3.85 million loan at eight percent interest, which would, however, require a HUD guarantee because he thought the loan could be arranged faster. Rosser had not determined whether to seek an outright loan from J. Development, to negotiate a lease-back arrangement, or to form a partnership. Rosser further testified that no more specific arrangements had been made because a CON had not been issued to Cumberland Care Center, but was unable to state why a loan had not been arranged contingent upon the granting of a CON.

▮ Neither the Revised Code nor the Ohio Administrative Code defines "financial feasibility," but the term must be considered in conjunction with the purpose of a CON, which is to ensure that unneeded facilities are not built, that services are not unnecessarily duplicated, and that unnecessary cost will not be incurred. *In re Cleveland Clinic Found./LakeWest Hosp.* (Apr. 27, 1995), Franklin App. No. 94APH08–1241, unreported, 1995 WL 250801.

▮ The evidence here shows the necessity of appellant's borrowing significantly more than is needed to construct the facility. Over ten percent of the loan amount is already allocated to nonproject costs. Further, the projected cost overrun exceeds the amount allowed by ODH rules. Ohio Adm.Code 3701–12–18(A)(8) specifically provides that cost overruns cannot exceed the maximum specified in the CON by more than ten percent. The amount specified in appellant's application was $3.58 million. While appellant is correct that cost overruns do not become a reviewable activity until after a CON is issued, nonetheless, ODH is faced with a situation where the applicant has already indicated that it must borrow and spend more than the law would permit. Appellant offered no evidence as to how it expected to construct its facility when ODH would not be able to approve all costs necessary in order to complete the project, including the projected cost overrun.

Further, while it is reasonable that there would not be a binding loan agreement until a CON was issued, the letter from Sussex Mortgage was little more than a polite expression of support and a summary of actions to be taken by appellant. While the letter from J. Development is more specific, much of the cost of that loan, as previously discussed, is not related to the project and, including the projected cost overrun, is for an amount that is more than ODH could approve. It is significant that, although appellant submitted its application February 19, 1995, appellant was unable to get more of a financial package together until a few days before the hearing, and then the financing information

was uncertain. Equally significant is the fact that appellant is apparently not able to obtain a loan directly from a lending institution despite its previous years' experience in the nursing home field.

The evidence presented to show that the project was financially feasible was, at best, vague and lacking any depth. As the hearing officer succinctly stated at page 18 of his report, "[t]he applicant has provided evidence that such a loan is possible; the applicant has proven nothing more." Thus, we find that the decision of the Director of ODH to deny the CON, based on a lack of evidence that the project was financially feasible, is supported by reliable, probative, and substantial evidence. Therefore, appellant's first assignment of error is over-ruled.

Given our finding that there was reliable, substantial, and probative evidence to support the director's decision that the project is not financially feasible, appellant's second assignment of error becomes moot and, therefore, is overruled.

For the foregoing reasons, appellant's assignments of error are overruled, and the order of the Director of Health denying the CON application submitted by Cumberland Care Center is affirmed.

*Order affirmed.*

REILLY and CLOSE, JJ., concur.

ARTHUR E. REILLY, J., retired, of the Tenth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.